Wright, J.,
delivered the opinion of the Court.
This bill was filed by Dudley Tally, who died shortly afterwards, and the cause was revived in the name of his executors. The object of the bill is to set aside a bill of sale, dated the 3d of November, 1853, executed by the said Tally to the defendant, Smith, for seven slaves, upon the ground, the execution of said bill of sale was *292 obtained by forced and undue influence. The Chancellor gave a decree for the complainants, setting aside the bill of sale. It appears that the bill of sale — with the notes for the consideration of the slaves — a deed of trust upon the slaves by Smith to secure the payment of the notes; Dudley Tally’s Will, and a deed from Dudley Tally to bis son Joseph, for his land, were all written by Smith, at the house of Dudley Tally; no one being present but the said Dudley, his wife, and said Smith. After the papers were thus prepared, as is proved by Anderson Carden, an attesting witness, Smith called at the store of the witness, late in the evening, and told him that Mr. Tally wished him to go to his house. The witness went, and was in the house a few minutes, when Smith beckoned him to the door, and, in a low tone of voice, to Id him that Tally wished him to step out for a few moments, which he did, and was out some ten or fifteen minutes, when Smith come to the door and told him he could come in. When he returned into the house, he found Tally propped up in the, bed with a book upon his knees; whereupon.Tally remarked, that what he was doing, he wanted nothing said about, that his children were dissatisfied, and that he was doing then what he thought was right by each; he then signed two papers, the witness holding the candle, while he signed them. The witness then attested them, without, at the time, knowing their contents, the papers being folded in such a manner, that he could not tell their contents. There was nothing said — -so far as the witness remembered— between Smith and Tally, after he got to the house, except that the latter desired him to go out; but he and Conway, the other attesting witness, went out at the *293 request of Smith, who stated it to be the wish of Tally, leaving Smith and Mrs. Tally alone with said Dudley. He did not remember seeing, or witnessing any notes at that time, and thought there was something going on that was not right. Some week ór ten days after the execution of these writings, Tally got the witness to examine a box of papers he had, to see what was in it, when he found a Will — a deed of trust and three notes, running-one, two and three years. The fourth paper Tally said was a bill of sale which Smith was to have left with him! and it was not there among his papers. He then • complained that Smith had not given his notes for enough, by some $100 to $800. The bill of sale and Will are in the record, and the former is attested by the said Car-den and Dr. Conway, and the latter by them and Smith. The bill of sale is absolute and conveys an immediate estate with warranty, and the Will recites that the testator, for the purpose of distributing his property, had resorted to the plan of selling the same in his lifetime, and dividing — as he did — the proceeds among his children— after giving to his wife a slave that come by her, with her increase, and certain small articles of personal estate. Dr. Conway, the other attesting witness, who was at Carden’s store when Smith came for them, gives, in substance, the same evidence as Carden, save that he and Carden attested four papers, two, at the request of Tally, and two others at the request of both Tally and Smith, and that they were asked -to retire by Tally or Smith. The papers had all been arranged before he and Carden arrived, and those retained by Tally had been signed by Smith, who acknowledged them. He knew nothing of the contract between Tally and Smith, at the time he at *294 tested the papers; and was surprised to see some two or three notes upon Smith, lying on the table, and which Smith handed to Tally, and they were put in a tin box. The witness supposed that instead of making a Will, the old man had sold his negroes to Smith. Ezekiel Inman had a conversation with Smith about writing the Will of Dudley Tally, in which he said Joseph Tally was about buying the land of Dudley; that ho was trying to get hint to do so ; thought that it was the best that could be done; that he had been trying to get Dudley to make the sale; that Dudley Tally had become very much alarmed as to his liability to pay a security debt for Thomas Jones; and that Tally had great confidence in him, (Smith,) and that he had advised the old man to sell his land; that Jones was likely to fail; that he was involved in the estates of William and James Jones, and he had advised Tally to sell his land and negroes and divide the notes among his children, during his life, and that would prevent the creditors of Jones from getting hold of anything except his loose, property; and he asked the witness what he thought of it; and then stated that he was going back in a few days to write Dudley Tally’s Will, and if he could keep the old woman out of the house, he thought he could get it fixed ; that she (meaning the wife of Tally) was rather suspicious, but he thought if ho could keep her out of the house, he could get the matter fixed to his notion; that he wanted to buy the negroes; that if he could get them at $2,750 or $2,800, he would buy them; and he thought he could, if he could keep the old lady out of the house long enough to get a talk with the old man. It appears that sometime before the execution of the bill of sale, at the *295 house of Tally, Smith attempted to buy two of the slaves, but Tally refused to sell them, and afterwards told Fox, a witness, he never would separate his slaves while he lived. Smith afterwards met this witness, and asked him if had heard from Tally, and he imformed him he had not; witness then asked him if he had bought Tally’s negroes, and he said no. The witness then said he did not think he would. Smith then said why, what makes you say so? The witness replied, that he had heard Mr. Tally say he would not sell them; that he never intended to separate them while he lived. Smith, then, under the asseveration of an oath, said, that he would work them out of him yet; that he had never undertaken anything, but what he had succeeded.'
It appears from the testimony of Dr. Moore, that he was called to see Dudley Tally, on the 28th of August, 1858, and was from that time, his physician up to his death, which occurred on the 23d of December next thereafter, not two months after the making of the bill of sale; that he was severely afflicted with dropsy, and had been under treatment five months before his first visit; was seventy-eight years of age, and labored under great physical debility, not being able to walk. His mind was tolerably good for one of his age, though he was manifestly in his dotage, that he was tapped, in all nine times — five before, and four after the transaction with Smith, and thirty-one gallons of water taken’ from him ; that though his mind and body seemed to improve with witness’ first visit up to the sale to Smith, yet the disease gained rapidly upon him, till his death. He owned no other slaves, but the seven, save those that *296 came by bis wife, and which he gave back to her, and was much attached to them; and we think it is established in this record, that his general purpose was not to give said slaves to his children, for the reason that he did not wish to separate them, and having twelve children, they could not be divided ; but that he intended, at the close of life, to sell them, with an injunction against their separation, and divide the proceeds among his children. There is no evidence that he meant to sell them under their value, nor is there any proof, that he desired that Smith should have them, above any one else. Whether Smith was in the habit of visiting Mr. Tally before he determined to effect the purchase of these slaves, or whether he did so after he had accomplished it, or how he gained the old man’s confidence, does not appear. He seems to have been without experience as a trader, while Smith possessed great art and shrewdness, and it is evident, practiced for sometime, upon the old man before he could gain his assent to trade with him. And we cannot account for the sudden and deep interest which Smith took in his affairs, unless for the purpose of obtaining from him an advantageous bargain.
It appears that Tally was one of the. securities of T. M. Jones, as the administrator of W. P. Jones— but there is no proof that he committed any devastavit, or that Tally had to pay, or was likely to have to pay, anything on this account; nor does Smith, in his answer, pretend any such thing. It seems that T. M. Jones, at Tally’s request, in October, 1853, went to see him, and assured him there was no danger of his having to pay anything, as surety for him, with which Tally was then apparently satisfied; and upon this, Smith relies, to show *297 that Tally could not have been deceived as to this matter; and at the same time, be denies that he said anything to alarm him, or excite his fears. But we are satisfied he did ; and, that, notwithstanding what T. M. Jones had said to him, Smith was still enabled to, and did, for the purpose of getting him to sell those slaves, alarm him by misrepresentations in relation to this sure-tyship, and that these fears, probably, influenced him to make the trade. That there was no reasonable cause for apprehension on the part of Tally, and that Smith knew it, is clear. The price agreed to be paid for these slaves, by Smith, was $2,850.00, in equal sums, at one, two and three years, free of interest, when we are satisfied, from the proof, though somewhat conflicting, they were, at the time of the sale, worth $4000,00. He intimates, in his answer, that he became bound to Tally to keep and not separate said slaves ; and though others, without this restriction, might have given more, yet with it, the price he agreed to pay, was full and adequate. There is no proof that he did become so bound; and it is shown by Joseph Hamilton’s evidence, that, within a day or two after the purchase of Tally, Smith attempted to sell the negroes, or a part of them, to him. It is said Tally was not to part with the possession of the slaves, so long as he lived; and as evidence of this, they were left by Smith in his possession ; and it is proved by the widow of Tally, that she heard him say so, and it is argued that this influenced the price. But Smith insists upon nothing of- the kind, in his answer, and there is no reservation in the bill of sale, to that effect. Besides, if this were so, Smith knew Tally could live but a few days.
*298 There is, as we think, nothing in the evidence of the widow of Mr. Tally, who is the chief witness for Smith, to destroy or overthrow the force of this testimony. She proves, that, upon one occasion, when Smith was at Tally’s, her husband asked her to leave the room ; and though she has, since her husband’s death, taken sides with Smith, against her husband’s family — she being a second wife— it is manifest, from this record, and she so states, that while Smith was making the visits to her husband, she called in question his motives, and used every effort to keep him away. Her credibility is, to some extent, shaken, and she is involved in material contradictory statements ; but, after all, the substance of her testimony does not, to any great extent, conflict with the other proof. She states, that she regarded Smith’s visits as based upon improper motives — that he alarmed her husband, as to his securityship for Jones — that she did not wish Smith to see him — -that he was sick, and Smith teased him too much about trading, and she strove to keep him from coming.
An attempt has been made to discredit the witness, Fox, but we think without a successful impeachment of his testimony. Besides, if it were out of the case, the result would be the same.
This bill of sale cannot stand, and the Chancellor, in so holding, gave the proper decree. It is not required that Dudley Tally should have been of unsound mind, as we have often held, to avoid it. It is laid down by Judge Story, (1 Story’s Eq., sec. 234,) that where a person, although not positively non compos, or insane, is yet of such great weakness of mind, as to be unable to guard himself against imposition, or to resist importunity or *299 undue influence, he will be protected in a Court of Equity, where an unfair advantage has been taken of his weakness to obtain an unreasonable bargain or benefit from him. And it is quite immaterial from what cause such weakness arises, whether from temporary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those accidental depressions, which result from sudden fear or overwhelming calamities. For it has been well remarked, that, although there is no direct proof that a man is non compos, or delirious, yet if he is a man of weak understanding, and is harrassed and uneasy at the time, or if the deed be executed in extremis, or by a paralytic, it cannot be supposed that he had a mind adequate to the business he was about, and he might be more easily imposed upon. And in sec. 235, it is stated as an obvious rule, that: weakness of understanding must constitute a most material ingredient in examining, whether a bond, or other contract, has been obtained by fraud, or imposition, or undue influence; for although a contract made by a man of sound mind and fair understanding, may not be set aside, merely from its being a rash, improvident, or hard bargain, yet, if the same contract be made with a person of weak understanding, there arises a natural inference, that it was obtained by circumvention or undue influence. And in sec. 238, it is said: the doctrine, therefore, may be laid down as generally true, that the acts and contracts of persons, who are of weak understandings, and who are thereby liable to imposition, will be held void in Courts of Equity, if the nature of the act or contract justify the conclusion, that the party has not exercised a deliberate judgment, but has been imposed *300 upon, circumvented, or overcome by cunning, or undue influence.
The application of these principles to the facts of this case, are decisive of it. There can be no question, that, this distressed old man, while laboring under great physical and mental prostration, was misled and imposed upon by the artful contrivances of Smith, and thereby an un-conscientious bargain extorted from him. In relation to the suretyship for Jones, Smith was guilty of intentional misrepresentation : 1 Story’s Eq., secs. 192-3; Johnson vs. Chadwell, 8 Hum., 145; Davis vs. McNalley, 5 Sneed, 583. The argument that the making of a second Will by Dudley Tally, on the evening before Ms death, and the institution of this suit, estop complainants from controverting his sanity at the time of the execution of the bill of sale, has nothing in it, because no one insists that he was positively non compos mentis; and it is, as we have seen, unnecessary that the proof should go that far.
Dudley Tally, or his representatives, are not to be repelled from relief, under the notion that this bill of of sale was made to defraud his creditors. Since such was his distress, and the weakness of his understanding, with the wiles resorted to, to obtain it, that it is to be regarded rather as the act of Smith, than of Tally. We do not intend to revoke the well established maxim : “ In pari delicto potior■ est conditio defendentis, et possidentis. But here these parties do not stand in pari delicto 1 Story’s Eq., sec. 298, 300; 5 Sneed, 583.
The decree will be affirmed.